UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD C. ROBERTS,

                      Plaintiff,                Civil Action No. 12-14661
                                                Honorable Victoria A. Roberts
                                                Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                      Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]

Plaintiff Ronald C. Roberts ("Roberts") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 13], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

I.      **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Roberts is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be DENIED, Roberts' Motion for Summary Judgment [11] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

On May 4, 2011, Roberts filed an application for DIB, alleging a disability onset date of October 15, 2009.  (Tr. 155-58).  This application was denied initially on August 25, 2011.  (Tr. 105-08).  Roberts filed a timely request for an administrative hearing, which was held on April 10, 2012, before ALJ Kevin W. Fallis.  (Tr. 28-90).  Roberts, who was represented by attorney Peter O'Toole, testified at the hearing, as did vocational expert ("VE") Ann Tremblay.  (*Id.*).  On May 14, 2012, the ALJ issued a written decision finding that Roberts was not disabled.  (Tr. 15-24).  On August 27, 2012, the Appeals Council denied review.  (Tr. 1-4).  Roberts filed for judicial review of the final decision on October 22, 2012.  (Doc. #1).

### B.    Background

#### 1.    *Disability Reports*

In an undated disability report, Roberts indicated that his ability to work is limited by knee and back pain, as well as "mental stress" resulting from his military service.  (Tr. 179).  Roberts completed high school but had no further education.  (Tr. 180).  Roberts reported that he stopped working on December 22, 2010, because of his conditions.  (*Id.*).  Prior to stopping work, Roberts had served in the army since 1985.  (Tr. 180, 187).  Roberts indicated that he had treated with doctors regarding his physical and mental impairments.  (Tr. 182).  At the time of the report, he was taking several medications, including mirtazapine (for depression) and Vicodin (for pain).  (*Id.*).

In a function report dated May 31, 2011, Roberts reported that he lives alone in an apartment.  (Tr. 198).  When asked to describe his daily activities, Roberts indicated that he sleeps only 2-3 hours per night and spends his days watching television, visiting family, or going outside.  (Tr. 199).  When asked to describe what he could do before the onset of his conditions

that he can no longer do, Roberts indicated that he could no longer work as a builder, welder, or truck driver.  (*Id.*).  His condition interferes with his sleep:  he is in pain and suffers from nightmares and anxiety.  (*Id.*).  Roberts prepares his own meals (soup, sandwiches, or frozen meals) on a daily basis, although he cannot stand for more than fifteen minutes at a time.  (Tr. 200).  He is able to do some "light cleaning," but he cannot do yard work because it is too painful. (Tr. 200-01).  He goes outside every day and is able to drive a car.  (Tr. 201).  He shops for food and clothes (in stores, by phone, or by mail), and he is able to pay bills, use a checkbook, and handle a savings account.  (*Id.*).  His hobbies include watching television, building "models," and collecting antique coins and guns.  (Tr. 202).  He does not spend time with other people because it is "hard to get along with others since the army."  (*Id.*).

When asked to identify functions impacted by his condition, Roberts checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, memory, concentration, and getting along with others.  (*Id.*).  He can walk for 10-15 minutes before he needs to rest for 15-20 minutes.  (*Id.*).  He usually finishes what he starts, and he is able to follow written and spoken instructions.  (*Id.*).  He does not get along with authority figures or handle stress well.  (Tr. 203-04).  He is afraid of flying, getting "shot at," people yelling, and traffic.  (Tr. 204).  He uses a cane and orthopedic shoe inserts, both of which were prescribed by a doctor in January of 2011.[1]  (*Id.*).

2.      *Roberts' Testimony*

At the time of the April 10, 2012 hearing before the ALJ, Roberts was living in an apartment with his father.  (Tr. 33, 35).  He testified that he graduated from high school and then served in the army for more than eighteen years before he was medically discharged.  (Tr. 37-

---

[1] In a subsequent disability appeals report dated October 24, 2011, Roberts indicated that he "can't hardly walk" and uses a wheelchair.  (Tr. 232).

3

38). He was receiving disability benefits from the military. (Tr. 44). After returning from Afghanistan, Roberts applied for some jobs and began taking an online college course in an effort to obtain a degree in small business management (ultimately, he had to drop this class because of problems with his GI bill). (Tr. 41-43).

From a physical perspective, Roberts testified that he suffers from constant, severe lower back pain that began when he "got blew up" in July of 2009. (Tr. 47-48). He said that the pain is a 10/10 on the pain scale, even with medication. (Tr. 49). In addition, he suffers from pain in both legs and feet (also a 10/10 on the pain scale); Roberts testified that his doctor wanted to perform surgery, but he declined because he had been advised that he would have an "80-percent chance of never walking again." (Tr. 49-51). Roberts has trouble going up and down stairs because his legs "give out" frequently, and he also has difficulty sitting and standing. (Tr. 35, 46). Roberts testified that both of his arms are "messed all up," he cannot feel his fingers, he suffers from constant nosebleeds, and he is "coughing [his] lungs up all the time." (Tr. 58, 60). Roberts testified that he can stand for 10-15 minutes at a time, sit for 40 minutes at a time, and lift up to 15 pounds. (Tr. 59-60). He cannot walk very far (according to Roberts, he is "supposed to be in a wheelchair"), and he falls once or twice a day when he walks. (Tr. 60, 86). Indeed, Roberts testified that his doctor prescribed a power scooter for him in December of 2011 because he was "not supposed to be walking hardly at all"; because of insurance complications, however, he had not yet been able to obtain the scooter. (Tr. 83-84).

Roberts also testified that he suffers from post-traumatic stress disorder ("PTSD"). (Tr. 52-53). He has difficulty getting along with other people and is quick to anger. (*Id.*). He experiences nightmares, flashbacks, panic attacks, and migraine headaches. (Tr. 53, 74). He testified that his doctor wants to put him in "an in-patient program for mental patients," but says

4

he is "not ready for that." (*Id.*). He sleeps only one hour per night (on a good night). (Tr. 57). He testified that he takes the medications prescribed by his doctor, and they do not cause any side effects. (Tr. 45-46).

Roberts is able to drive and, once or twice a week, he goes to the grocery store or runs other errands. (Tr. 36-37). However, he usually drives only short distances – no more than ten or fifteen miles at a time. (Tr. 37). He does the dishes, watches television, cooks microwaveable meals, and uses the computer. (Tr. 62-64). He previously enjoyed building and flying remote control helicopters but had not done so in several months. (Tr. 67). Roberts testified that he drinks "one or two beers a day" and occasionally smokes marijuana (when he is out of pain medication). (Tr. 69).

### 3. *Medical Evidence*

#### (a) *Physical Impairments*

The ALJ found that Roberts suffers from the severe physical impairments of degenerative disc disease of the lumbar spine, knee pain, asthma, and tinnitus. (Tr. 17). Medical evidence pertaining to each of these conditions is discussed below.

On March 22, 2010, x-rays obtained at the VA Hospital of Roberts' lumbar spine showed multilevel degenerative changes and spondylosis, which could be better evaluated with MRI examination. (Tr. 279). Roberts obtained an MRI of his lumbar spine on May 28, 2010, which showed (a) a bulging disc at L5-S1 with "superimposed left paracentral disc herniation which abuts the traversing left S1 nerve root and impinges on the exiting left L5 nerve root resulting in severe left foraminal stenosis"; and (b) mild central canal narrowing at L3-L4, L4-L5, and L5-S1. (Tr. 246-47). This was coded as a "major abnormality." (Tr. 247). Roberts' diagnosis was subsequently described as "small herniated disc, L5-S1 with nerve root impingement per MRI." (Tr. 423).

5

On November 24, 2010, Roberts had a neurosurgery consultation stemming from his ongoing low back and leg pain.  (Tr. 252).  At that visit, Roberts had full strength in his upper and lower extremities, and his gait was within normal limits.  (*Id.*).  The neurosurgeon examined Roberts' MRI results and concurred that he had a protruding disc at L5-S1 "with foraminal stenosis compressing the left L5 root."  (*Id.*).  He indicated that Roberts preferred to try conservative treatment before undergoing surgery and, as a result, recommended that he be referred to a pain clinic for injections.  (*Id.*).

On June 13, 2011, Roberts was again seen in follow-up for his ongoing back pain.  (Tr. 516).  At that visit, Roberts reported that he had missed multiple medical appointments because of a variety of circumstances (his grandmother had passed away, he had been jailed briefly for carrying a concealed weapon without a permit, and his aunt was "on her death bed").  (*Id.*).  Following the examination, he agreed to undergo physical therapy with the understanding that if it was ultimately unsuccessful, he would be referred to a pain clinic for injections.  (Tr. 516-19).

On July 14, 2011, Roberts was seen for his initial physical therapy consultation.  (Tr. 512-15).  At that visit, Roberts again reported severe and ongoing back pain, which increased with prolonged walking, standing, siting, lifting, and bending.  (Tr. 512).  His reported pain was a 10/10 on the pain scale.  (Tr. 513).  On examination, Roberts had a positive straight leg raise test on the left; his Faber's test was positive for increased back pain; and his femoral nerve conduction test was also positive for increased back pain.  (Tr. 514).  He was unable to perform single leg standing and had tenderness throughout the lumbar spine, paraspinals, gluteals and quad lumborum.  (*Id.*).  The physical therapist was uncertain how much therapy Roberts would be able to tolerate and indicated that he would be seen on a trial basis.  (Tr. 515).  It appears that Roberts did attend physical therapy on at least one more occasion, although he was unable to

6

tolerate certain procedures.  (Tr. 510-11).

Roberts also complained of chronic pain in both knees.  However, x-rays taken on both April 16, 2010, and June 6, 2010, were normal.  (Tr. 275-78).  In addition, Roberts complained of chronic pain in both feet and ankles.  An x-ray taken of his left foot on April 6, 2010, was abnormal in the sense that there was "a cortical density of the posterior lower distal tibial margin in addition to a faint rounded density in the distal tibial metadiaphysis."  (Tr. 348).  A dedicated lower extremity x-ray or MRI was recommended if clinically indicated.  (*Id.*).  Subsequent x-rays of Roberts' feet, taken on June 2, 2010, were normal.  (Tr. 341-42).  That same day, however, Roberts had x-rays taken of both ankles:  his right ankle was normal, but his left ankle showed "focal ankylosis or osseous bridging between the distal tibia and fibula," which required further attention.  (Tr. 343-44).

In terms of Roberts' asthma, an EEG and ECG were performed at the VA Hospital on June 1, 2010; these tests were normal.  (Tr. 393).  A chest x-ray performed on June 2, 2010, showed only mild hyperaeration of the lungs, and a pulmonary function test performed on June 22, 2010, showed no significant obstruction but a significant response to bronchodilators, which was "suggestive of asthma."  (Tr. 392-93).

Roberts underwent a consultative physical examination with Dr. Samiullah Sayyid, an internal medicine physician, on August 16, 2011.  (Tr. 497-99).  At that examination, Roberts complained of knee and back pain, along with insomnia, ringing in the ears, and possible chronic obstructive pulmonary disease ("COPD").  (Tr. 497).  On physical examination, Roberts had diminished breath sounds bilaterally and restricted range of motion in the lumbar spine and hips.  (Tr. 498).  Tenderness was noted in the lumbar spine, and deep tendon reflexes were lost in both the upper and lower extremities.  (*Id.*).  Roberts' stance, posture, and ambulation were normal;

7

however, he was unable to squat completely, unable to walk on heels and toes, and able to get on and off the examination table only with difficulty.  (Tr. 499).  Dr. Sayyid diagnosed chronic knee pain due to arthritis, chronic back ache due to degenerative disc disease, PTSD, possible COPD, insomnia, and ringing in the ears.  (*Id.*).

On August 24, 2011, a physical residual functional capacity ("RFC") assessment was completed.  (Tr. 98-100).  Colleen Burton, a state agency single decisionmaker, examined Roberts' medical records and concluded that he retains the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 2 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.  (Tr. 98-99).  Ms. Burton further concluded that Roberts is limited to only occasional pushing or pulling with his right lower extremity and that he needs to use a cane for pain relief.  (Tr. 99).  In addition, Ms. Burton concluded that Roberts can only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; stoop; kneel; crouch; and crawl.  (*Id.*).

### (b)    Mental Impairments

The ALJ also concluded that Roberts suffers from the severe mental impairments of PTSD and alcohol and marijuana abuse.  (Tr. 17).  Medical evidence pertaining to each of these impairments is discussed below.

An initial mental health assessment dated March 22, 2010, indicates that Roberts was suffering from insomnia, nightmares, angry outbursts, and chronic pain.  (Tr. 482-83).  On examination, Roberts' mood was depressed, anxious, and irritable, and his affect was flat.  (Tr. 487).  He was diagnosed with PTSD, depression, anxiety, and alcohol and cannabis abuse and assigned a Global Assessment of Functioning ("GAF")[2] score of 50.  (Tr. 489).[3]

---

[2]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

At a May 3, 2010 mental health appointment, Roberts again reported experiencing nightmares, insomnia, and frequent angry outbursts. (Tr. 466). He was fully oriented with an anxious mood and wavering eye contact. (Tr. 468). At a May 24, 2010 mental health appointment, Roberts was alert and attentive, with an anxious mood and affect and inconsistent and evasive eye contact. (Tr. 460). He reported continued insomnia and nightmares, and indicated that he was irritable and hypervigilant (constantly checking and re-checking locks on the doors and vehicles). (Tr. 461).

On May 27, 2010, Roberts presented for a mental examination. (Tr. 443-55). He reported that he continued to use alcohol and marijuana, largely in response to his chronic pain. (Tr. 447). His mood was anxious, and he appeared restless, fatigued, and tense. (Tr. 449). He reported continued difficulty sleeping, and indicated that he conducted "nightly patrols around the inside and outside parameter [sic] of his residence." (Tr. 450). He further indicated that he suffered from anxiety attacks "at least a couple times per day" and had a "very short fuse." (Tr. 451). His recent memory was mildly impaired, and his immediate memory was moderately impaired. (*Id.*). He was again diagnosed with PTSD, alcohol abuse, and cannabis abuse and assigned a GAF score of 50. (Tr. 453). The examining physician further commented:

> Despite current psychiatric intervention, Mr. Roberts presents with a constellation of PTSD symptomology, which, unfortunately, still resides within a severe range of disturbance. With regard to frequency, PTSD symptoms are manifested on a weekly basis, and once autonomically triggered, it typically takes the man a few moments to calm down and soothe himself.
>
> The man's sleep hygiene is very poor, and further complicated by

---

[3] VA records indicate that Roberts tested positive for marijuana and opiates on April 16, 2010. (Tr. 283). On November 24, 2010, a determination was made that Roberts' alcohol and marijuana abuse were related to his PTSD. (Tr. 331). Indeed, it was specifically noted that Roberts "continues to abuse alcohol and marijuana as a means of coping with chronic pain and chronic manifestation of PTSD related pathology." (*Id.*).

9

> intrusive recall and residual somatic complaints.   He remains tired,
> irritable, and somewhat disengaged from daily activities, largely preferring
> to remain isolated and in highly controlled social settings (his home).

(*Id.*).

Roberts had another mental health appointment on June 18, 2010, at which he reported that even with medication, he was sleeping only two hours at a time.  (Tr. 369).  He experienced frequent nightmares and was irritable and hypervigilant.  (*Id.*).  He indicated that he owned a piece of property in northern Michigan and went there on weekends to "be alone."  (*Id.*).  At a July 28, 2010 mental health appointment, Roberts complained of anxiety, insomnia, nightmares, and extreme anger, as well as excruciating physical pain.  (Tr. 366-68).  On examination, he was alert and fully oriented with good insight and judgment, coherent thoughts, and an anxious mood and affect.  (Tr. 367).

Following his July 28, 2010 appointment, Roberts was a no-show for scheduled mental health appointments in August, September, and October 2010.  (Tr. 323).  On October 22, 2010, Roberts had a follow-up appointment regarding both his lower back pain and his PTSD.  (Tr. 358).  He indicated that he was "feeling worse with mental health issues and back pain."  (*Id.*).  The nurse's notes indicate that his PTSD symptoms were under control, but he had not kept his mental health appointments in quite some time.  (*Id.*).  On examination, the nurse noted that Roberts' psychiatric symptoms were improved but still present.  (Tr. 360).  At a November 1, 2010 medication review, Roberts was alert and oriented with improved affect.  (Tr. 336).  He reported that his current medications were "helpful" and that he was "sleeping well" with these medications.  (*Id.*).

On November 17, 2010, Roberts underwent a physical examination at the VA Hospital to determine whether he suffered from a traumatic brain injury ("TBI").  (Tr. 316-21).  After examining Roberts, Dr. Dennis Malloy concluded that given Roberts' "undertreated mental

health issue it is really hard to quantify the magnitude of disease that can be attributed to TBI itself.  His history is sctchy [sic] at best and no supportative [sic] documentation.  By his history it is at least consistent with a TBI injury."  (Tr. 321).  Roberts was directed to follow up with a neurosurgery consultation and with the VA's mental health providers.  (*Id.*).

Roberts underwent a consultative psychological examination with Matthew Dickson, Ph.D., on July 5, 2011.  (Tr. 492-95).  Roberts indicated that he suffers from PTSD, anxiety, stress, and nightmares, along with pain.  (Tr. 492).  He reported having nightmares, difficulty concentrating, and difficulty sleeping.  (*Id.*).  Dr. Dickson noted that VA reports indicated that Roberts has a "possible traumatic brain injury" resulting from an explosion in Afghanistan, and that he uses alcohol and marijuana as "a coping mechanism to deal with chronic pain issues and chronic manifestations of PTSD related pathology."  (*Id.*).  Roberts also reported having difficulty getting along with others, saying that he prefers to be alone.  (Tr. 493).  On mental status examination, Roberts seemed to be in contact with reality.  (Tr. 494).  His speech was unimpaired, his affect was appropriate to mood, and he did not demonstrate anxiety.  (*Id.*).  Some deficiencies were noted on memory testing.  (*Id.*).  After completing the examination, Dr. Dickson diagnosed PTSD, alcohol abuse, and marijuana abuse and assigned a GAF score of 55.  (Tr. 495).  Dr. Dickson further stated:

> It is my impression that Ronald's mental abilities to understand, attend to, remember, and carry out instructions are mildly impaired.  Ronald reported recent memory and focusing problems.  These reported problems were not significant during this exam.  It is my impression that Ronald's abilities to perform activities within a schedule, at a consistent pace, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychological symptoms are moderately impaired.  Ronald's abilities to respond appropriately to co-workers and supervision in the workplace are mildly impaired.

(*Id.*).

11

On July 8, 2011, Jerry Csokasy, Ph.D., reviewed Roberts' records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique. (Tr. 95-97, 100-01). Dr. Csokasy noted that Roberts suffers from an anxiety-related disorder (as defined in Listing 12.06) and a substance addiction disorder (as defined in Listing 12.09). (Tr. 96). Dr. Csokasy opined that Roberts is mildly limited in his activities of daily living, and moderately limited in both social functioning and maintaining concentration, persistence, and pace.[4] (*Id.*). Dr. Csokasy concluded that Redlin could perform simple/routine tasks on a sustained basis with minimal interactions with others. (Tr. 101).

### 4. Vocational Expert's Testimony

Ann Tremblay testified as an independent vocational expert ("VE"). (Tr. 75-86). The VE first testified that Roberts has no past relevant work. (Tr. 77). The ALJ then asked the VE several hypotheticals, which were progressively more restrictive. (Tr. 77-80). Eventually, the VE was asked to imagine a claimant of Roberts' age, education, and work experience, who was limited to light work, with the following additional restrictions: lifting up to 20 pounds occasionally; lifting/carrying up to 10 pounds frequently; standing/walking for about 2 hours and sitting for up to 6 hours in an 8-hour work day, with normal breaks; occasional pushing and pulling; occasional use of foot controls; never climbing ladders, ropes or scaffolds; occasional

---

[4] Specifically, in his RFC Assessment, Dr. Csokasy opined that Roberts has no significant limitations in the ability to carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and work week without interruptions from psychological symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; get along with co-workers without distracting them; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 100-01). Dr. Csokasy further opined that Roberts is moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (*Id.*).

12

climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching and crawling; frequent bilateral handling of objects, defined as gross manipulation; frequent fingering, defined as fine manipulation of items no smaller than the size of a ballpoint pen; limited to jobs which can be performed while using a hand held assistive device for uneven terrain and ambulation with the contra lateral upper extremity used to lift and carry objects up to exertional limits; must avoid concentrated exposure to environmental irritants such as fumes, odors, dusts and gases; must avoid all use of hazardous moving machinery; must avoid all exposure to unprotected heights; limited to occupations which do not require fine hearing capability; work is limited to simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements involving only simple work related decisions and routine work place changes; no contact with the general public and only occasional superficial interaction with work co-workers and no tandem tasks.  The VE testified that the hypothetical individual would be capable of working in the positions of assembler (8,200 jobs in the state of Michigan) and inspector (1,600 jobs).  (*Id.*).  However, the VE further testified that if the hypothetical individual was confined to a power scooter, there would be no jobs in the national economy that could be performed without accommodation.  (Tr. 85-86).

### C.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Roberts is not disabled under the Act.  At Step One, the ALJ found that Roberts has not engaged in substantial gainful activity since October 15, 2009, the alleged onset date.  (Tr. 17).  At Step Two, the ALJ found that Roberts has the severe impairments of degenerative disc disease of the lumbar spine, knee pain, post-traumatic stress disorder, asthma, tinnitus, and alcohol and marijuana abuse.  (*Id.*).  At Step Three, the ALJ found that Roberts's impairments, whether considered alone or in

14

combination, do not meet or medically equal a listed impairment.  (Tr. 17-19).

The ALJ then assessed Roberts's residual functional capacity ("RFC"), concluding that

he is capable of performing light work with the following limitations:

> … lifting up to 20 pounds occasionally; lifting/carrying up to 10 pounds
> frequently; standing/walking for about 2 hours and sitting for up to 6 hours
> in an 8-hour work day, with normal breaks; occasional pushing and
> pulling; occasional use of foot control operation; never climbing ladders,
> ropes or scaffolds; occasional climbing of ramps or stairs; occasional
> balancing, stooping, kneeling, crouching and crawling; frequent bilateral
> handling of objects, defined as gross manipulation; frequent fingering,
> defined as fine manipulation of items no smaller than the size of a
> ballpoint pen; limited to jobs which can be performed while using a hand
> held assistive device for uneven terrain and ambulation with the contra
> lateral upper extremity used to lift and carry objects up to exertional
> limits; must avoid concentrated exposure to environmental irritants such
> as fumes, odors, dusts and gases; must avoid all use of hazardous moving
> machinery; must avoid all exposure to unprotected heights; limited to
> occupations which do not require fine hearing capability; work is limited
> to simple, routine and repetitive tasks performed in a work environment
> free of fast paced production requirements involving only simple work
> related decisions and routine work place changes; no contact with the
> general public and only occasional superficial interaction with work co-
> workers and no tandem tasks.

(Tr. 19-23).

At Step Four, the ALJ determined that Roberts has no past relevant work.  (Tr. 23).  At

Step Five, the ALJ concluded, based in part on the VE's testimony, that Roberts is capable of

performing a significant number of jobs that exist in the national economy.  (Tr. 23-24).  As a

result, the ALJ concluded that Roberts was not disabled under the Act.  (Tr. 24).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact

15

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by

16

substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

In his motion for summary judgment, Roberts argues that the ALJ's decision is not supported by substantial evidence. Although Roberts' strongest arguments are not particularly well-developed, as discussed below, he appears to assert that the ALJ erred in evaluating his mental and physical impairments, as well as his credibility.

### 1.     The ALJ's Step Three Analysis

Roberts argues that "[t]here is absolutely no rationale nor discussion of [his] medical problems in the ALJ's decision." (Doc. #11 at 11). While this is an overstatement with respect to the decision as a whole, as discussed in detail below, it is absolutely correct with respect to the ALJ's Step Three "analysis" of Roberts' physical impairments. The Court rejects the Commissioner's argument that Roberts waived this "argument [by] not clearly assert[ing] or develop[ing]" it. (Doc. #13 at 16). Although Roberts should have more pointedly and fully developed this argument, under the facts of this case, where Roberts asserts generally that the ALJ's decision is not supported by substantial evidence and specifically references a lack of a "discussion of Roberts' medical problems" which, as discussed below, amounts to a "failure [by the ALJ] to identify the standard to be applied and to apply that standard," *Christephore v. Comm'r of Soc. Sec.*, 2012 WL 2274328, at *7 (E.D. Mich. June 18, 2012) (Roberts, J.), the Court finds it necessary and appropriate to address and resolve this issue. *See, e.g., Demars v. Comm'r of Soc. Sec.*, 2013 WL 1326300, at *5 (E.D. Mich. Mar. 31, 2013) ("…resolving the substantial evidence inquiry necessarily involves considering the entire record and the basis of each of the ALJ's findings"). *See also Longworth*, *supra,* at 595. Moreover, the Court notes that

17

it has an "obligation to respect, within reason, the remedial purposes underlying the Social Security Act." *Kirk v. Comm'r of Soc. Sec.*, 2013 WL 1305286, at *5 (W.D. Mich. Feb. 28, 2013). In the words of the *Kirk* court, "The Court fails to discern how the purposes of the Act are furthered by giving legitimacy to an administrative action so utterly deficient." *Id.*[5]

> a.   The ALJ's Failure to Specifically Evaluate Roberts'
>      Impairments In Light Of Listing 1.04A Constitutes Legal Error

In this case, the ALJ specifically found at Step Two that Roberts had the severe impairments of degenerative disc disease of the lumbar spine, knee pain, PTSD, asthma, tinnitus, and alcohol and marijuana abuse. (Tr. 17). Then, at Step Three, the ALJ proceeded to thoroughly evaluate only whether Roberts' mental impairments, considered singly or in combination, met or medically equaled the criteria of Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), or 12.09 (substance addiction disorders). (Tr. 17-19). The ALJ failed to consider at Step Three whether Roberts' severe *physical* impairments met or medically equaled a listed impairment. Indeed, the ALJ failed to identify a single physical impairment Listing that he purportedly considered at this step. (*Id.*). This failure was error requiring remand because it shows the ALJ's decision is not supported by substantial evidence, and amounts to a "failure to identify the standard to be applied and to apply that standard." *See Christephore*, 2012 WL 2274328, at *7.

Under the theory of presumptive disability, a claimant is eligible for benefits if he has an impairment that meets or medically equals a listed impairment. *Id.* at *6. When considering presumptive disability at Step Three, "an ALJ must analyze the claimant's impairments in

---

[5] The Court also notes that "Social Security proceedings are inquisitorial, rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). As such, the United States Supreme Court has made clear that "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 111. When he does not do so, his findings necessarily are not supported by substantial evidence.

relation to the Listed Impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review." *Id.* (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)).  An ALJ's failure to sufficiently articulate his Step Three findings is error.  *See M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 858-59 (E.D. Mich. 2012); *Reynolds*, 424 F. App'x at 416; *Tapp v. Astrue*, 2011 WL 4565790, at *5 (E.D. Ky. Sept. 29, 2011) (discussing reversal in a series of cases where the ALJ "made only a blanket statement that the claimant did not meet or equal a Listing section").

Thus, in numerous cases similar to this one, courts have recognized that an ALJ's failure to explicitly consider whether a claimant's impairments meet or medically equal a listed impairment constitutes legal error.  For example, in *Bolla v. Comm'r of Soc. Sec.*, 2012 WL 884820, at *6-8 (E.D. Mich. Feb. 3, 2012), the ALJ concluded at Step Two that the plaintiff had the severe impairments of multiple sclerosis and depression, but then simply stated, in conclusory fashion, that "the impairments, or combination of impairments, do not meet or medically equal the specific criteria of 1.00 Musculoskeletal Symptoms, 11.00 Neurological, 12.00 Mental Disorders." *Id.* at *6.  The ALJ specifically considered the plaintiff's depression in light of Listing 12.04 (affective disorders), but did not consider any other Listing – including Listing 11.09 (multiple sclerosis) – in any detail whatsoever.  *Id.*  In finding the ALJ's Step Three analysis insufficient under the above standards, the *Bolla* court held that the "ALJ's lack of narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact …." *Id.*  Consequently, the *Bolla* court determined that remand was appropriate.  *Id.* at *8.

Similarly, in *Christephore*, *supra*, the court held that the ALJ erred in failing "to evaluate (or even mention) the relevant listing" when determining medical equivalence at Step Three.

19

*Christephore*, 2012 WL 2274328, at *5.  In that case, the ALJ concluded that the plaintiff had

the severe impairment of HIV, but then failed to consider whether the plaintiff met or medically

equaled Listing 14.08 (HIV infection), saying only that the plaintiff's impairments did not meet

or medically equal Listing 14.00 (Immune System Disorders).  *Id.* at *5-6.  In concluding that the

ALJ erred, the court explained:

> The ALJ does not evaluate Plaintiff's physical symptoms in relation to
> those described in 14.00 and does not articulate his reasons for finding that
> Plaintiff's symptoms do not meet or equal those criteria.  His conclusory,
> one-sentence statement that Plaintiff's impairments do not meet or
> medically equal the criteria of 14.00 is contrary to the requirements that
> ALJs explain the reasons for their decisions.

*Id.* at *6.  A similar conclusion was reached in *M.G.*, where "the ALJ did not cite, discuss, or

resolve any conflicts in the evidence in concluding that [the claimant] did not meet or medically

equal a Listing.  Nor did the ALJ even identify which Listing(s) [claimant's] impairments were

compared with."  *M.G.*, 861 F. Supp. 2d at 858.

In this case, the ALJ erred in failing to consider whether Roberts' lumbar spine

impairment meets or medically equals Listing 1.04A ("disorders of the spine").  The ALJ

explicitly found that Roberts suffers from degenerative disc disease of the lumbar spine.  (Tr.

17).  Because he concluded that Roberts suffers from this condition, the ALJ should have

discussed Roberts' impairment relative to Listing 1.04A.  His failure to do so constitutes legal

error.  *See e.g.*, *Christephore*, 2012 WL 2274328, at *7; *M.G.*, 861 F. Supp. 2d at 858-59; *Bolla*,

2012 WL 884820, at *6-8.

> b.      *The ALJ's Error Was Not Harmless*

This Court will not, however, overturn an ALJ's decision if the failure to articulate Step

Three findings was harmless.  *See M.G*, 861 F. Supp. 2d at 859.  Such an error is harmless where

"concrete factual and medical evidence is apparent in the record and shows that even if the ALJ

had made the required findings, the ALJ *would have* found the claimant not disabled…." *Id.* at

861 (quoting *Juarez v. Astrue*, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010)) (internal

quotations omitted) (emphasis in original).  In short, the case law discussed in the preceding

section simply describes the minimum level of articulation an ALJ must provide regarding his

Step Three analysis.  In *Staggs v. Astrue*, 2011 WL 3444014, at *3 (M.D. Tenn. Aug. 8, 2011),

the court explained that the Sixth Circuit "has consistently rejected a heightened articulation

standard, noting . . . that the ALJ is under no obligation to spell out 'every consideration that

went into the step three determination' or 'the weight he gave each factor in his step three

analysis,' or to discuss every single impairment."  *Staggs*, *supra* at *3 (quoting *Bledsoe v.

Barhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).  The *Staggs* court further stated, "Nor is the

procedure so legalistic that the requisite explanation and support must be located entirely within

the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe*

implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting

his step three analysis."  *Id.* (citing *Bledsoe, supra* at 411); *see also Smith v. Comm'r of Soc.

Sec.*, 2012 WL 4897364, at *6 (E.D. Mich. Sept. 14, 2012).  Thus, remand is not required where

the evidence makes clear that even if he "had made the required findings, [he] *would have* found

the claimant not disabled," *M.G.,* 861 F.Supp.2d at 861.

Conversely, remand is appropriate in cases where the district court's review of the ALJ's

decision and the record evidence leaves open the possibility that a Listing is met.  *See Reynolds*,

424 F. App'x at 416 ("in this case, correction of such an error is not merely a formalistic matter

of procedure, for it is possible that the evidence [the plaintiff] put forth could meet this listing");

*see also May v. Astrue*, 2011 WL 3490186, at *9 (N.D. Ohio June 1, 2011).

Here, in order for Roberts to meet the criteria of Listing 1.04A, he must show that he has

21

a disorder of the spine (i.e., degenerative disc disease) with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.04A.  It is well-settled that to "meet" a Listing, a claimant's impairments must satisfy each and every element of the Listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

In this case, the ALJ failed entirely to evaluate the objective medical evidence in light of the relevant Listings.  For example, the ALJ's decision fails to mention that the record contains substantial objective medical evidence of nerve root compression, despite the fact that this is a critical component of Listing 1.04A.  In formulating Roberts' RFC, the ALJ said, "An MRI of the lumbar spine performed March 22, 2010, confirmed disc bulging (Exhibit 2F, page 148)."  (Tr. 20).  This is incorrect.  No MRI was performed on March 22, 2010[6]; rather, MRI results from May 28, 2010 establish that:  "At L5-S1, there is a disc bulge with superimposed left paracentral disc herniation which abuts the traversing left S1 nerve root and *impinges on the exiting left L5 nerve root resulting in severe left foraminal stenosis*."  (Tr. 246-47).  Elsewhere in the record, Roberts' diagnosis was described as "small herniated disc, L5-S1 *with nerve root*

---

[6] The portion of the record cited by the ALJ actually consists of x-rays (not an MRI) performed on March 22, 2010.  (Tr. 421).  Those x-rays showed multilevel degenerative changes, which the doctor indicated could be better evaluated with MRI examination.  (*Id.*).  An MRI of Roberts' lumbar spine was subsequently performed on May 28, 2010.  (Tr. 246-47).

*impingement per MRI*."   (Tr. 423) (emphasis added).   Again, the ALJ fails to mention this objective evidence of nerve root compression.

In addition to evidence of nerve root compression, Listing 1.04A also requires evidence of neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and, if there is involvement of the lower back, a positive straight-leg raising test. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.04A.   The record contains undisputed evidence of most – if not all – of these indicators, yet the ALJ's decision fails to mention any of it.   For example, Roberts testified that, in addition to back pain, he suffers from pain in both legs and feet (Tr. 49-51) and he cannot feel his fingers (Tr. 60), all of which, coupled with other medical evidence in the record, at least arguably evidences a neuro-anatomic distribution of pain.   He further testified that he has difficulty going up and down stairs because his legs "give out" frequently, and he falls at least once or twice a day (motor loss with associated muscle weakness).   (Tr. 35, 46, 60, 86).   Indeed, Roberts testified at the hearing that, three months earlier, his primary care physician had prescribed a motorized scooter.   (Tr. 84).   Because of an insurance coverage dispute, Roberts had not yet received the scooter; in the interim, however, he had borrowed a wheelchair and was using that assistive device for mobility.   (Tr. 86).[7]

Moreover, in discussing the results of Roberts' consultative physical examination, performed by Dr. Sayyid on August 16, 2011, the ALJ described the results of the physical examination as follows:

> On physical examination, the claimant had decreased breathing sounds and restricted range of motion in the lumbar spine and hips.   Tenderness was also noted in the lumbar spine.   The claimant's stance, posture and ambulation were normal; but he was not able to squat completely.   The

---

[7] This significant issue is discussed in detail in the next section below.

claimant had some difficulty getting on and off the examination table.

(Tr. 22). All of these findings – including Roberts' limited range of motion in the spine – are borne out by the record evidence. (Tr. 498-99). However, the ALJ ignored Dr. Sayyid's finding that Roberts' deep tendon reflexes were absent in both his upper and lower extremities, a finding that is relevant under Listing 1.04A. (Tr. 498). Similarly, the ALJ's decision makes no mention whatsoever of Roberts' positive straight leg raising test on July 24, 2011 (Tr. 514), which also is relevant to whether the criteria of this Listing are met.

In summary, there is no dispute that at least several of the criteria of Listing 1.04A are satisfied, and certainly enough record evidence from which the ALJ could find that all of the Listing's criteria are satisfied. The ALJ concluded that Roberts has degenerative disc disease of the lumbar spine. (Tr. 17). There is objective MRI evidence of nerve root compression. (Tr. 246-47). There also is evidence in the record of a limited range of lumbar motion (Tr. 498), a fact that the ALJ noted (Tr. 22), as well as reflex loss (Tr. 498) and a positive straight leg raise test (Tr. 514), facts that the ALJ failed to mention. In addition, Roberts' femoral nerve conduction test was positive for increased back pain (*id.*), and he testified to neuro-anatomic distribution of pain and motor loss. (Tr. 35, 46, 49-51, 60, 84, 86). All of these facts suggest that had the ALJ considered Roberts' back impairment in light of Listing 1.04A, he could very well have determined that Roberts met or medically equaled[8] that Listing's criteria.

Taking all of these facts together, the Court cannot conclude that the ALJ's error in

---

[8] Even if Roberts cannot demonstrate that he meets the criteria of Listing 1.04A, he can still satisfy his burden at Step Three by proving that he has an impairment (or combination of impairments) that medically equals this Listing. To do so, he must "present medical evidence that describes how [his] impairment is equivalent to a listed impairment." *Lusk v. Comm'r of Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004). This means that Roberts must present medical findings showing symptoms or diagnoses equal in severity and duration "to *all* the criteria for the one most similar listed impairment." *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 874 (6th Cir. 2003) (internal quotations omitted).

24

failing to specifically consider Roberts' impairments in light of Listing 1.04A was harmless. Regardless of how the ALJ might ultimately decide Roberts' claims, at this juncture, the Court cannot say that, if the ALJ had made the required findings at Step Three, he necessarily *would have* found that Roberts does not meet or medically equal the relevant Listing.[9]  And, if he does find that the evidence establishes that Roberts meets or medically equals Listing 1.04A, then Roberts would be presumptively entitled to benefits.  *See Christephore*, 2012 WL 2274328, at *6.  Because the Court cannot say that the ALJ's error was harmless, remand is appropriate.  *See Reynolds*, 424 F. App'x at 416.

### 2.      *The ALJ's RFC Finding*

#### a.      *Physical Impairments*

In his motion for summary judgment, Roberts asserts that, "There is not a scintilla of evidence to support [the ALJ's] RFC assessment that Mr. Roberts would be capable of work at the light exertional level including work that requires lifting up to 20 pounds, standing, and walking on a sustained basis."  (Doc. #11 at 13).  Roberts further asserts that the ALJ erred in failing to discuss his testimony that his physician prescribed him a motor scooter; according to Roberts, "The ALJ never rejects the need for the motor scooter in his decision, yet never accommodates it within his RFC."  (*Id.*).  The Court finds merit to these arguments.

As an initial matter, the ALJ either failed to mention or mischaracterized much of the objective medical evidence that underlies his physical RFC finding.  As set forth above, with respect to Roberts' lumbar spine, the ALJ noted that MRI results "confirmed disc bulging," but he failed to mention that these same results also provided objective evidence of significant nerve root compression.  The ALJ also failed to mention medical evidence of reflex loss and a positive

---

[9] Nor is it the Court's role to make such factual determinations in the first instance.  *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *Bolla*, 2012 WL 884820, at *6.

straight leg raising test.  (Tr. 498, 514).  Moreover, when discussing the chronic pain in Roberts'

legs and feet, the ALJ incorrectly stated:  "X-rays taken of the claimant feet (Exhibit 2F, page

68) and ankles (Exhibit 2F, page 71) on June 2, 2010, were also normal."  (Tr. 21).  This is

incorrect.  An x-ray taken of Roberts' left ankle on June 2, 2010 was not "normal":  it showed

"focal ankylosis or osseous bridging between the distal tibia and fibula," which required further

attention.  (Tr. 343-44).  Moreover, the ALJ failed to mention that an x-ray taken of Roberts' left

foot just two months earlier, on April 6, 2010, was also abnormal in the sense that there was "a

cortical density of the posterior lower distal tibial margin in addition to a faint rounded density in

the distal tibial metadiaphysis."  (Tr. 348).  A dedicated lower extremity x-ray or MRI was

recommended.  (*Id.*).  Thus, the ALJ's physical RFC finding – particularly in terms of Roberts'

ability to stand and walk on a sustained basis and use foot controls – is not supported by the

objective medical evidence.[10]

      The ALJ also erred in failing to discuss Roberts' testimony that he was prescribed a

motor scooter, or to otherwise consider the impact of this testimony on his RFC.  At the hearing,

after both Roberts and the VE had completed their testimony, the ALJ asked Roberts' counsel

---

[10] Plaintiff also argues that the ALJ erred in finding him less than fully credible.  (Doc. #11 at
13-15).  The credibility determination, guided by Social Security Ruling ("SSR") 96-7p,
describes a two-step process for evaluating symptoms.  *See Duncan v. Sec'y of Health & Human
Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).  "First, the adjudicator must consider whether there is
an underlying medically determinable physical or mental impairment … that can be shown by
medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  Second, SSR 96-7p
directs that whenever a claimant's allegations regarding "the intensity, persistence, or
functionally limiting effects of pain or other symptoms are not substantiated by the objective
medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire
case record."  Here, the ALJ discounted Roberts' credibility, finding that his "subjective
complaints do not conform to the objective evidence."  (Tr. 22).  In reaching this conclusion, the
ALJ again relied on faulty interpretations of Roberts' lumbar spine MRI and June 2, 2010 ankle
x-rays, as detailed above.  (*Id.*).  On remand, the ALJ should reevaluate Roberts' credibility in
light of the fact that many of his subjective complaints in fact appear to be supported by
objective medical evidence.

whether he wished to present a closing argument.  (Tr. 83).  At that point, Roberts' counsel apparently submitted to the ALJ a document which he characterized as "a prescription for a chair for nerve impingement for a power scooter," issued in December 2011 or January 2012.[11]  (Tr. 83-84).  Upon questioning by the ALJ, Roberts then testified that his primary care doctor at the VA Hospital had written him the prescription for the scooter because he was "not supposed to be walking hardly at all" because he "fall[s] down all the time."[12]  (Tr. 84).  The ALJ then re-questioned the VE, who testified that a hypothetical individual of Roberts' age, education, and work experience, who was confined to a power scooter, would be unable to perform any jobs existing in the national economy.  (Tr. 85-86).  In his decision, however, the ALJ made no mention of the prescribed scooter, its impact on Roberts' ability to perform work, or its impact on the number of jobs (if any) that would be available to Roberts.

Perplexingly, the prescription for the power scooter is not in the record, despite the fact that Roberts' counsel clearly submitted it to the ALJ and, at one point, the ALJ clearly was reading from the document itself.  (Tr. 86-87).  The ALJ specifically questioned Roberts' counsel about the underlying nerve root impingement that formed the basis for the prescription:

> … I'm going to hand you back that prescription … -- the basis of that prescription is a nerve root impingement.  I don't see that in the record right now.  I need something indicating objective evidence.  There's got to be an MRI to see there's a nerve root impingement, otherwise we're basing it upon subjective complaints of the Claimant.  Okay?  What I'm

[11] Although Roberts had not obtained the scooter at the time of the hearing because of a coverage dispute with his insurer, he testified that while waiting to receive the scooter, he had been using a borrowed wheelchair.  (Tr. 83-86).

[12] The Commissioner asserts that Roberts "did not discuss that he needed a motor scooter at his hearing, and when he completed a questionnaire concerning his use of assistive devices, he indicated that he used shoe inserts and a cane." (Doc. #13 at 15).  Neither of these arguments has merit.  As set forth above, Roberts did testify at the hearing that his physician felt he needed a power scooter and, thus, prescribed it for him.  (Tr. 84).  Moreover, the questionnaire relied on by the Commissioner was completed in May of 2011, some six months before the scooter was prescribed.  (Tr. 204).

> looking for is objective records of that…. If I buy in to that prescription
> and what our vocational expert has testified to, I'm probably looking at a
> partial favorable based upon the date of that prescription….So find where
> that nerve root impingement is and get that in; vitally important to this
> case.

(Tr. 87-88). As set forth above, the record does contain MRI evidence of nerve root
impingement. (Tr. 246-47). Given the ALJ's own statements, then, had he taken note of this
objective medical evidence, it appears that he would have found Roberts disabled, at least for
some period of time. Thus, the ALJ's failure to discuss the proffered prescription and to evaluate
its effect on Roberts' physical RFC (and, as a result, its effect on Roberts' ability to perform a
significant number of jobs existing in the national economy) constitutes further legal error
warranting remand.

### b. Mental Impairments

Roberts also argues that the ALJ's RFC finding does not adequately address his moderate
limitation with respect to concentration, persistence, and pace ("CPP"). (Doc. #11 at 11-13).
Specifically, Roberts asserts that "there are no non-exertional limitations whatsoever in the
ALJ's RFC determination that would account for his severe impairment findings, just generic
findings of 'simple, routine and repetitive tasks in a work environment free of fast paced
production requirements involving only simple work related decisions and routine work place
changes.'" (*Id.* at 12). The Court disagrees.

Contrary to Roberts' characterization, the ALJ's RFC contains more than "generic
findings" and limitations. (*Id.*). The ALJ did not merely limit Roberts to "unskilled work" or
"simple tasks," which courts have found problematic under certain circumstances. *See Badour*,
2011 WL 3320872, at *7 (E.D. Mich. July 18, 2011) ("…'unskilled work,' or 'simple work' are
generally insufficient to account for moderate concentrational impairments"); *see also Green v.
Commissioner of Soc. Sec.*, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009). Rather, in

28

this case, the ALJ accounted for Roberts' moderate limitations in CPP by limiting him to "simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements involving only simple work related decisions and routine work place changes …." (Tr. 19). Courts have held that similar limitations are adequate to account for moderate deficiencies in CPP. *See, e.g., Layne v. Commissioner of Soc. Sec.*, 2009 WL 2496474, at *3 (E.D. Mich. Aug. 17, 2009) (substantial evidence supported ALJ's finding that claimant with moderate deficiencies in CPP could perform simple, unskilled work of "1-2-3- step operations"); *Edmunds v. Commissioner of Soc. Sec.*, 2010 WL 3633768, at *8 (E.D. Mich. Aug. 17, 2010) (substantial evidence supported ALJ's finding that claimant with moderate CPP deficiencies could perform "simple, routine, repetitive" work). The ALJ also limited Roberts to having "no contact with the general public and only occasional superficial interaction with work co-workers and no tandem tasks." (Tr. 19). This further distinguishes this case from ones that include only "generic" limitations.

In this case, Roberts has not explained why more detailed or more specific nonexertional limitations are required in order to adequately account for his deficiencies in CPP. Nor has he offered any suggestion as to what those additional limitations should be. And, although Roberts asserts that the ALJ failed to incorporate any of Dr. Dickson's findings into the RFC (Doc. #11 at 13), he has provided no explanation for how he believes the ALJ's RFC finding is inconsistent with Dr. Dickson's opinion. Under the facts of this case, by expressly limiting Roberts to "simple, routine and repetitive tasks," in a work environment "free of fast paced production requirements" and significant contact with others," and involving only "simple work related decisions and routine work place changes," the ALJ adequately accounted for Roberts' moderate limitations in CPP.

### III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be DENIED, Roberts' Motion for Summary Judgment [11] be GRANTED IN PART, the ALJ's decision be REVERSED, and this case be REMANDED for further proceedings consistent with this Recommendation.

Dated: October 24, 2013                        s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

### <u>NOTICE</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 24, 2013.

                                               s/Felicia M. Moses
                                               FELICIA M. MOSES
                                               Case Manager